UNITED STATES DISTRICT COURT
EASTERN DISTIRCT OF LOUISIANA

| | | |
|---|---|---|
| JUBAN LAND HOLDINGS, LLC AND | * | CIVIL ACTION NO. |
| JUBAN TRAILS DEVELOPMENT, LLC | * | |
| | * | SECTION " " |
| versus | * | JUDGE |
| | * | |
| UNITED STATES ARMY CORPS OF | * | MAGISTRATE ( ) |
| ENGINEERS AND MARTIN MAYER, | * | JUDGE |
| IN HIS OFFICIAL CAPACITY AS | * | |
| CHIEF OF THE REGULATORY | * | |
| DIVISION | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * *

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**NOW INTO COURT**, comes Juban Land Holdings, LLC ("Juban Land") and

Juban Trails Development, LLC ("Juban Trails") (collectively, "Juban") which files this

Complaint against the United States Army Corps of Engineers and Martin Mayer, solely

in his capacity as Chief of the Regulatory Division of the New Orleans District of the

United States Army Corps of Engineers, and which respectfully represents as follows:

### PARTIES

1.

Juban Land Holdings, LLC is a Louisiana limited liability company that owns the

property that is the subject of this dispute.

2.

Juban Trails Development, LLC is a Louisiana limited liability company that is and

will be the developer of the property that is the subject of this dispute.

3.

Named defendant is the United States Army Corps of Engineers ("Corps"), an agency of the United States of America which has the power to sue and be sued and who made the decisions that are the subject of this dispute.

4.

Also named defendant is Martin Mayer who is employed by the Corps and is the Chief of the Regulatory Division in the New Orleans District, which involves issuing wetlands jurisdictional determinations and Clean Water Act Section 404 permits.

5.

Mr. Mayer is responsible for approving such jurisdictional determinations and permits and the Corps is liable and/or responsible for the acts and/or omissions of Mr. Mayer in the commission of his duties as Chief of the Regulatory Division in the New Orleans District.

6.

Mr. Mayer is sued only in his official capacity as Chief of the Regulatory Division.

**JURISDICTION AND VENUE**

7.

Jurisdiction in this court is proper under 28 U.S.C. §1331.

4943715.v2

8.

Venue in this court is proper under 28 U.S.C. §1391(b)(1) and (e) as the Corps and Mr. Mayer are domiciled and/or located within the Eastern District of Louisiana and a substantial part of the events have occurred and/or will occur in the Eastern District.

## BACKGROUND

### Clean Water Act Section 404

9.

Pursuant to Clean Water Act Section 404, 33 USCA §1344, a permit from the Corps is required for the "discharge of dredged or fill material into the navigable waters at specified disposal sites."

10.

Navigable waters "means the waters of the United States, including the territorial seas." 33 USCA §1362(7).

11.

The Corps has defined and continues to define "waters of the United States" to include "wetlands adjacent to" certain types of waters, including traditional navigable waters (*i.e.*, those currently used, or were used in the past, or which may be susceptible to use in interstate or foreign commerce), and relatively permanent, standing or continuously flowing bodies of water. *See* 33 CFR §328.3 (March 20, 2023).

3

12.

To assist in determining the presence of wetlands on a tract of land for which a permit *may* be required, a jurisdictional determination can be requested from the Corps, which is defined as "a written Corps determination that a wetland and/or waterbody is subject to regulatory jurisdiction under Section 404 of the Clean Water Act (33 U.S.C. 1344)" (hereinafter "Jurisdictional Determination"). *See* 33 CFR §331.2.

13.

To obtain a permit to dredge or fill lands with waterways or wetlands governed under the Clean Water Act Section 404, a person must submit an application to the Corps and meet the terms and conditions of multiple regulatory provisions, including those found in 33 CFR Part 320, Part 323, and Part 325.  *See* 33 CFR §323.1 ("This regulation prescribes, in addition to the general policies of 33 CFR part 320 and procedures of 33 CFR part 325, those special policies, practices, and procedures to be followed by the Corps of Engineers in connection with the review of applications for DA[1] permits to authorize the discharge of dredged or fill material into waters of the United States pursuant to section 404 of the Clean Water Act (CWA) (33 U.S.C. 1344).").

14.

When a permit is issued by the Corps, compensatory mitigation must be obtained by the permittee "to offset environmental losses resulting from unavoidable impacts to

---

[1] DA means Department of Army.

waters of the United States authorized by DA permits." *See* 33 CFR Part §332.3(a)(1); see also 33 CFR §§320.4(r) and 33 CFR Part 332.

## The Property

15.

Juban owns certain property (the "Property") in Livingston Parish, Louisiana which is located along Buddy Ellis Road to the south and Interstate I-12 to the north.

16.

The Property was formerly owned by Weyerhaeuser and used to grow timber.

17.

Juban purchased the Property for residential and other development; and Juban intends to develop the entirety of the Property.

18.

Prior to any development and under the law prior to May 25, 2023, Juban requested and obtained Jurisdictional Determinations from the Corps regarding the presence of wetlands on the Property.

19.

The first Jurisdictional Determination, dated January 5, 2017, covered approximately 562 acres of the Property (known as the Juban Trails Tract).

20.

The second Jurisdictional Determination, dated May 25, 2018, covered approximately 115 acres of the Property (known as the Indigo Trails Tract).

4943715.v2

21.

These tracts are contiguous, whereby the Indigo Trails Tract is a subdivision of the entire Juban Trails development and are both owned by Juban Land.

22.

These prior Jurisdictional Determinations indicated that there are substantial jurisdictional wetlands and non-wetlands waters on the Property.

23.

Thus, the Corps has already made its initial determination regarding the presence of jurisdictional wetlands on the Property.

24.

As a result and under the provisions cited above, under the law prior to May 25, 2023, Juban must obtain from the Corps a permit in order to develop the Property.

**Indigo Trails Tract Permit Application**

25.

Juban did obtain the appropriate Clean Water Act Section 404 permit/authorization from the Corps for residential development on portions of the Indigo Trails Tract.

26.

Those portions of the Indigo Trails Tract have since been developed or are being developed.

4943715.v2

27.

In April 2023, Juban applied for a permit to develop the remainder of the Indigo Trails Tract.

28.

To date, that application for the Indigo Trails Tract is pending with the Corps and a permit has not been issued; and, absent relief, Juban will have to obtain the permit and pay for compensatory mitigation.

**Juban Trails Tract Permit Application**

29.

In April 2018, Juban applied for a permit to develop the Juban Trails Tract; however, for various reasons, that application was returned to Juban.

30.

There is currently no pending permit application for development of the Juban Trails Tract.

31.

Nevertheless, absent relief prayed for herein, in order to develop the Juban Trails Tract, Juban will have to submit (or re-submit) a permit application.

4943715.v2

**The *Sackett* Decision, the Corps' Response, and the *Lewis* Decision**

32.

On May 25, 2023, the U.S. Supreme Court rendered its decision in *Sackett v. EPA,* 598 U.S. 651, 143 S.Ct. 1322, 215 L.Ed.2d 579 (2023).

33.

The *Sackett* decision focuses on determining the proper scope of jurisdiction afforded the Corps over what should be considered 'navigable waters' under the Clean Water Act (Sometimes hereafter, the "CWA").

34.

In *Sackett*, the Supreme Court identified the types of "waters" that are legally jurisdictional under the Clean Water Act, finding "the *Rapanos* plurality was correct: the CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Sackett*, 143 S.Ct at 1337, citing *Rapanos v. United States*, 547 U.S. 715, 126 S.Ct. 2208, 165 L.Ed.2d 159.

35.

The *Rapanos* court stated: "The phrase [waters of the United States] does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Rapanos*, 126 S.Ct. at 2225.

8

36.

The Supreme Court in *Sackett* also identified the types of "wetlands" that are jurisdictional under the Clean Water Act, specifically holding: "In sum, we hold that the CWA extends to only those wetlands that are 'as a practical matter indistinguishable from waters of the United States.' *Rapanos*, 547 U.S., at 755, 126 S.Ct. 2208 []. This requires the party asserting jurisdiction over adjacent wetlands [here, the Corps] to establish 'first, that the adjacent [body of water constitutes] ... 'water[s] of the United States,' (i.e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Sackett*, 143 S.Ct at 1341.

37.

The Supreme Court ultimately held: "In sum, we hold that the CWA extends to only those 'wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right,' so that they are 'indistinguishable' from those waters." *Sackett*, 143 S.Ct at p. 1344.

38.

On August 29, 2023, the Corps issued a final rule addressing the *Sackett* decision by amending the definition of the 'waters of the United States' in 33 CFR §328.3; the rule was published on September 8, 2023, and was effective as of that date.  88 Fed. Reg. 61964 (Sep. 8, 2023).

39.

Generally, the Corps removed certain parts of the definition no longer legally viable under *Sackett* (*e.g.*, the significant nexus definition), retained the relatively permanent standard noted above, and amended the definition of 'adjacent' to mean "having a continuous surface connection."

40.

Despite the clear holding of *Sackett* and the wording of the final rule addressing the *Sackett* decision, the Corps stated on September 5, 2023: "The New Orleans District [of the Corps] will be operating under the pre-2015 Regulatory regime with applicable Sackett guidance."

41.

Under *Sackett*, any wetlands on the Property do not fall within the scope of jurisdiction under the Clean Water Act.

42.

On September 25, 2023, although no longer properly under Corps' jurisdiction, Juban submitted a letter and an expert report (the "Request") to the Corps regarding its lack of jurisdiction over the Property, a copy of which is attached hereto and incorporated herein as Exhibit "A".

43.

Although not necessary, in the Request Juban sought to have the Corps declare that no jurisdictional wetlands remained on the Property in an attempt to amicably address Juban's ability to develop its property.

44.

To date, the Corps has not provided a substantive response to the Request, despite requests for a response as recently as January 12, 2024.

45.

The Corps has issued several pronouncements regarding its interpretation of *Sackett* and its interpretation of what constitutes a "continuous surface connection."

46.

Generally, the Corps has stated that a continuous surface connection exists when wetlands are connected to jurisdictional water by a discrete feature like a non-jurisdictional ditch, swale, pipe, or culvert.

47.

The Corps, along with the Environmental Protection Agency, issued a 58-page guidance document on November 15, 2023, entitled *Updates for Tribes and States on "Waters of the United States"* (the "November 2023 Guidance").

48.

The November 2023 Guidance, at p. 48, reiterates the above statements regarding a continuous surface connection, stating: "Wetlands also have a continuous surface

4943715.v2

connection when they are connected to a jurisdictional water by a discrete feature like a non-jurisdictional ditch, swale, pipe, or culvert."

49.

On December 18, 2023, the Fifth Circuit decided the case of *Lewis v. United States*, --- F.4th --- (5 Cir. 2023), 2023 WL 8711318, which further clarifies the Corps' lack of jurisdiction over the Property.

50.

In *Lewis*, the Fifth Circuit held that the property at issue in *Lewis* was not subject to federal jurisdiction under *Sackett*.

51.

Even further, the Corps' "***unwillingness to concede its lack of regulatory jurisdiction***" prompted the Fifth Circuit to emphatically state "enough is enough." *Lewis*, 2023 WL 8711318, at pp. *1 and *4 (emphasis added).

52.

Two tracts of land were involved in *Lewis*.

53.

As to the first Lewis tract (the east tract), waters flowed through roadside ditches to an unnamed tributary (which flowed intermittently and which was described as "an unnamed non-'relatively permanent water' tributary"), and then into Colyell Creek (a relatively permanent waterway), and then to Colyell Bay, a traditional navigable waterway about ten to fifteen miles away.

12

54.

As to the second tract (the west tract), water flowed through roadside ditches to Switch Cane Bayou, to Colyell Creek, and then Colyell Bay.

55.

The Court applied "the Sackett 'adjacency' test" which, "[f]rom a legal standpoint,… significantly tightens the definition of federally regulable wetlands, as compared with the [pre-*Sackett*] "significant nexus" test and interim administrative regulations." *Lewis*, 2023 WL 8711318, at p. *2.

56.

Applying *Sackett* to these facts, the *Lewis* Court held: "There is no 'continuous surface connection' between any plausible wetlands on the Lewis tracts and a 'relatively permanent body of water connected to traditional interstate navigable waters.' Recall that the nearest relatively permanent body of water is removed miles away from the Lewis property by roadside ditches, a culvert, and a non-relatively permanent tributary. In sum, it is not difficult to determine where the 'water' ends and any 'wetlands' on Lewis's property begin—there is simply no connection whatsoever. There is no factual basis as a matter of law for federal Clean Water Act regulation of these tracts."  *Lewis*, 2023 WL 8711318, at pp. *3.

57.

Analogously to *Lewis*, with respect to the Juban Property:

a.  There is no "continuous surface connection" between any plausible wetlands on the Juban Property and a "relatively permanent body of water connected to traditional interstate navigable waters."

b.  The nearest traditional navigable waterway is miles away from the Juban Property.

c.  It is not difficult to determine where the "water" ends and any "wetlands" on the Juban Property begins as there is simply no connection whatsoever.

58.

The November 2023 Guidance and the statements by the personnel from the Corps' New Orleans District as to a continuous surface connection are in direct conflict with the Supreme Court's decision in *Sackett* and the Fifth Circuit's decision in *Lewis*.

59.

Consequently, despite these legally-binding decisions on the Corps, the Corps is applying and will apply the November 2023 Guidance as to a continuous surface connection to the Property and confirm, re-affirm, and/or continue its initial determination that jurisdictional wetlands exist on the Property, all of which is contrary to *Sackett* and *Lewis* and is thus subjecting Juban to the abusive, expensive, and time-consuming pre-*Sackett* administrative appeal and/or permit processes.

4943715.v2

*Sackett* **and** *Lewis* **Applied to the Property**

60.

Based on the Supreme Court's holding in *Sackett* and the Fifth Circuit's decision in *Lewis* regarding the scope of jurisdiction under the Clean Water Act, any wetlands that exist on the Property do not fall within the scope of jurisdiction under the Clean Water Act.

61.

As set forth in *Lewis*, "there is no factual basis as a matter of law for federal Clean Water Act regulation of" the Property.

62.

Specifically, there are no water courses traversing or adjoining the Property that are 'navigable' or 'traditional navigable waters' (that is, interstate waters that were either navigable in fact and used in commerce or readily susceptible of being used in that way), nor are there any such waters near the Property.

63.

There is a relatively permanent, standing, or continuously flowing body of water forming a geographical feature described in ordinary parlance as a stream (*i.e.*, a relatively permanent waterbody) only on the very westernmost boundary of the Property known as West Colyell Creek.

64.

This West Colyell Creek flows into the very same Colyell Creek referred to and dealt with in *Lewis*.

65.

There are no relatively permanent waterbodies traversing the Property, only "abandoned channels" which no longer carry flow or which have channel bottoms higher than the ordinary highwater mark of West Colyell Creek.  *See* Exhibit A, pp. 8 of 47.

66.

To the extent that there are any ditches, swales, or other water courses traversing the Property through which water may flow into West Colyell Creek during rain events, the water courses are not relatively permanent waterbodies, but are, at best, ephemeral in nature, flowing *only* when there is rainfall.  *See* Exhibit A, pp. 8 of 47.

67.

These water courses do not have or maintain a continuous flow and/or are not relatively permanent in nature.  *Id*.

68.

Indeed, many such water courses have not had flowing water for years.  *Id*.

69.

"No continuous surface connections exist between West Colyell Creek and any wetlands present on the subject property."  *Id*.

16

70.

As such, any wetlands on the Property cannot have, and do not have, a continuous surface connection with relatively permanent, standing, or continuously flowing bodies of water because no such bodies of water traverse the Property.

71.

The mere presence of West Colyell Creek along the westernmost boundary does not render the wetlands on the Property within the scope of jurisdiction under the Clean Water Act for at least three reasons:

a.      The wetlands do not physically abut or touch a jurisdictional water;

b.      There is no continuous surface connection between West Colyell Creek and any wetlands on the Property; and

c.      There is a clear demarcation or delineation between West Colyell Creek and any wetlands on the Property and in any event, any wetlands that might be on or near the Property are easily distinguished from those bodies of water.

72.

The jurisdictional status of the wetlands on the Property is identical to the wetlands described in the *Lewis* case as the only connection between any "wetlands" on the Property and a jurisdictional water (here, West Colyell Creek) are ditches, swales, or other water courses that are non-jurisdictional features which have, at best, ephemeral flow only during rain events.

17

## COUNT ONE: DECLARATORY JUDGMENT

73.

In a case of actual controversy, any court of the United States "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 USC §2201(a).

74.

The Corps has refused to declare its lack of jurisdiction over the Property.

75.

Instead of declaring its clear lack of jurisdiction, it appears the Corps is attempting to force Juban into a time-consuming and expensive process by which the Corps evaluates its own lack of jurisdiction, which is damaging to Juban and in this instance specifically contrary to *Sackett* and *Lewis*.

76.

There is an actual controversy between Juban and the Corps for the following reasons:

a.      Despite *Sackett* and *Lewis*, the Corps is applying its November 2023 Guidance, as written, to Juban's detriment with the application of the November 2023 Guidance to the Property resulting in a finding that jurisdictional wetlands exist on the Property, mandating further expensive proceedings by Juban to cause *Sackett* and *Lewis* to be properly applied to the Property;

18

b.      Under the Corps' current approach and the November 2023 Guidance, Juban has a permit application pending for the Indigo Trails Tract and a permit will have to be issued prior to any development on that portion of the Indigo Trails Tract, which is contrary to *Sackett* and *Lewis*;

c.      Under the Corps' current approach and the November 2023 Guidance, Juban will have to submit a permit application for the Juban Trails Tract and such permit would have to be issued prior to any development on that portion of the Juban Trails Tract, which is contrary to *Sackett* and *Lewis*;

d.      The permit process is costly and time-consuming and Juban will incur substantial expense to pursue permits;

e.      Obtaining a permit will require compensatory mitigation, which is extremely costly to obtain;

f.      Obtaining a Jurisdictional Determination is a costly and time-consuming process (under normal circumstances, often taking over one year or more) and Juban will incur substantial expenses to obtain a Jurisdictional Determination;

g.      There is a substantial backlog of requests for jurisdictional determinations in the New Orleans District which will further delay the issuance of a statement from the Corps regarding the application of *Sackett* and *Lewis* to the Property; and

h.      Juban is incurring significant costs on a daily basis in the form of interest payments required from its original purchase of the Property and, making its

19

financial matters worse, now has substantial lost income due to its inability to sell all or part of the Property to willing buyers pending the Corps' delay in implementing the *Sackett* and *Lewis* decisions.

77.

Juban requests that its rights and legal relations be declared, namely, that under the Supreme Court decision in *Sackett* and the Fifth Circuit's decision in *Lewis*, the wetlands located on the Property are not within the scope of the Corps' jurisdiction under the Clean Water Act and thus a permit from the Corps under Clean Water Act Section 404 (33 USC §1344) is not required to discharge fill materials on the Property and/or to develop the Property.

78.

Juban also requests that its rights and legal relations be declared, namely, that the interpretation of a 'continuous surface connection' currently applied by the Corps (as set forth in statements by personnel from the Corps' New Orleans District and the November 2023 Guidance, p. 48), which the Corps is illegally applying to the Property, is contrary to the Supreme Court's decision in *Sackett* and the Fifth Circuit's decision in *Lewis*; and that a roadside ditch/culvert with ephemeral or intermittent flow and/or a non-relatively permanent water cannot serve as a 'continuous surface connection.'

4943715.v2

## COUNT TWO: INJUNCTIVE RELIEF

79.

Based on the foregoing, Juban further requests that this Court, consistent with *Sackett* and *Lewis*, issue injunctive relief precluding the Corps from (a) exercising jurisdiction over the Property and (b) requiring Juban to obtain a permit from the Corps under Clean Water Act Section 404 (33 USC §1344) in order to discharge fill materials on the Property and/or to develop the Property.

**WHEREFORE**, Juban Land Holdings, LLC and Juban Trails Development, LLC, pray that this Complaint be filed and deemed good and sufficient and that, after all due proceedings be had, they be awarded any or all of the following:

A.     A declaratory judgment, providing:

1.     That under the Supreme Court decision in *Sackett* and the Fifth Circuit's decision in *Lewis*, the wetlands located on the Property are not within the scope of the Corps' jurisdiction under the Clean Water Act and thus a permit from the Corps of Engineers under Clean Water Act Section 404 (33 USC §1344) is not required to discharge fill materials on the Property and/or to develop the Property, and

2.     That the interpretation of a 'continuous surface connection' currently applied by the Corps (as set forth in statements by personnel from the Corps' New Orleans District and the November 2023 Guidance), which is being applied to the

Property, is contrary to the Supreme Court's decision in *Sackett* and the Fifth Circuit's decision in *Lewis* and that a roadside ditch/culvert with ephemeral or intermittent flow and/or a non-relatively permanent tributary cannot serve as a 'continuous surface connection.'

B.      Injunctive relief in favor of Juban and against the Corp precluding the Corps from (a) exercising jurisdiction over the Property and (b) requiring Juban to obtain a permit from the Corps under Clean Water Act Section 404 (33 USC §1344) in order to discharge fill materials on the Property and/or to develop the Property.

C.      Any and all other relief under law and equity to which Juban may be entitled.

Respectfully submitted,

*/s/ Peter J. Butler, Jr.*

Peter J. Butler, Jr. (La Bar No. 18522)
Richard G. Passler (La Bar No. 21006)
Philip J. Giorlando (La Bar No. 38234)
**BREAZEALE, SACHSE & WILSON, LLP**
BankPlus Tower, Suite 1500
909 Poydras Street
New Orleans, Louisiana 70112-4004
Main Phone: (504) 584-5454 / (504) 619-1800
Fax Number:  504-584-5452
Email:    peter.butler.jr@bswllp.com
          richard.passler@bswllp.com
          philip.giorlando@bswllp.com

and

Carroll Devillier, Jr. (La Bar No. 30477)
Danielle L. Borel (La. Bar No. 35669)
John B. King (La. Bar No. 17004)
**BREAZEALE, SACHSE & WILSON, LLP**
301 Main Street, 23rd Floor (70801)
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197
Telephone: 225-387-4000
Facsimile: 225-381-8029
Email:    carroll.devillier@bswllp.com
          danielle.borel@bswllp.com
          john.king@bswllp.com

*Counsel for Juban Land Holdings, LLC*
*and Juban Trails Development, LLC*

23

## **VERIFICATION**

STATE OF TEXAS

COUNTY OF _Dallas_

      BEFORE ME, the undersigned authority, a Notary Public, duly commissioned and

qualified in and for the State and Parish aforesaid, personally came and appeared:

### **WM. CHRISTOPHER REEDER**

who, after being duly sworn by me, deposed and said:

      I am a Manager of Juban Land Holdings, LLC and Juban Trails Development, LLC.

I have read the foregoing Complaint and to the best of my knowledge, information and

belief, the facts and circumstances as pled in the foregoing are true and correct.

 

WM. CHRISTOPHER REEDER

SWORN TO AND SUBSCRIBED before me, this _23rd_ day of

_January_, 2024.

NOTARY PUBLIC (#128828642)

Printed Name: _Mariaelena De Leon_

My commission expires: _Dec 15, 2027_

MARIAELENA DE LEON
NOTARY PUBLIC
STATE OF TEXAS
ID# 128828642
EXPIRES 12-15-2027

24

4943715.v2